**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JACALYN CHAPMAN,<br><br>      *Plaintiff*,<br><br>  v.<br><br>SALESFORCE, INC. LORI CASTILLO MARTINEZ and JOHN DOES 1–10 (said names being fictitious); and ABC CORPORATIONS 1–10(said corporations being fictitious),<br><br>      *Defendants*. | No. 2:25-cv-12363<br>    (MEF)(MAH)<br><br>**OPINION and ORDER** |

**Table of Contents**

I.   **Background**

II.  **A Valid Agreement?**

      A.    **The Law**

      B.    **The Agreements**

      C.    **Analysis**

III. **Scope**

IV. **Conclusion**

\*   \*   \*

**I.   Background**

A woman[1] ("the Plaintiff") sued her former employer[2] and supervisor[3] (together, "the Defendants") for workplace discrimination and retaliation.  See Complaint, Jury Demand and Designation of Trial Counsel ("Complaint") (ECF 1-1) ¶¶ 70, 73, 78, 82.

In response, the Defendants have moved to compel arbitration, citing the Plaintiff's employment contract.  See Notice of Defendants Salesforce, Inc. and Lori Castillo Martinez's Motion to Compel Arbitration (ECF 8) at 2; Defendants Salesforce, Inc. and Lori Castillo Martinez's Memorandum of Law in Support of Motion to Compel Arbitration ("Defendants' Brief") (ECF 8-1) at 1-3.

The motion is granted.

\*   \*   \*

Whether a dispute should be sent to arbitration is mainly a matter of answering one question and then maybe another.

The first question: does "a valid agreement to arbitrate exist[]?"  Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009).

If the answer is "yes," then there is a second question: whether "the particular dispute falls within the scope of that [valid] agreement."  Id.

Take up these questions in turn: the first question in Part II, and the second in Part III.

**II.  A Valid Agreement?**

   **A.   The Law**

Deciding whether a supposed agreement to arbitrate is "valid," id., requires a look to the "ordinary state-law principles that govern the formation of contracts."  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

---

[1]   Jacalyn Chapman.

[2]   Salesforce, Inc.

[3]   Lori Castillo Martinez.

2

The parties' briefs assume that the state law in play here is New Jersey's. See Defendants' Brief at 8 & n.2; Plaintiff's Opposition to Defendants' Motion to Compel Arbitration ("Plaintiff's Brief") (ECF 9) at 3.

So the Court applies New Jersey law. See, e.g., Marino v. Brighton Gardens of Mountainside, 697 F. Supp. 3d 224, 229 (D.N.J. 2023).[4]

---

[4] Are there outer limits to the idea that the parties' assent, through their legal briefs, can fix the law that applies? Consider two reasons to answer "yes." First, parties cannot generally stipulate what the law is and expect a court to follow along if they get it wrong. See, e.g., Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991); Est. of Sanford v. Comm'r, 308 U.S. 39, 50-51 (1939); 83 C.J.S. Stipulations § 28 (2000). And if a party cannot stipulate that Florida law is A when it is really B, does it make sense for a party to be allowed to take what might be a more dramatic step --- to stipulate (through its legal brief) that Florida law applies in the first place, when it is really Oregon law or Texas law that should control? Second, choice of law provisions built into contracts are generally enforced --- but typically only if there is at least some connection between the subject of the underlying contract and the law chosen. See Restatement (Second) of Conflict of Laws § 187(2); John F. Coyle, A Short History of the Choice-of-Law Clause, 91 U. Colo. L. Rev. 1147, 1175-76 (2020). This might suggest that even when the parties' briefs assume that, say, Florida law applies, the court should kick the tires --- and opt not to apply Florida law if it has no connection to the case.

The two above points might imply limits on parties' ability to establish choice of law through the statements or assumptions in their briefs. But to come to a non-tentative conclusion --- that would likely require answering additional questions. Take three.

[1] Questions about the proper balance between the federal courts' law-declaring and dispute-resolving responsibilities --- and its implications for resolving the tension between (a) ignoring the parties' wrongful legal stipulations (because courts have a duty to say what the law (actually) is, see Amanda Frost, The Limits of Advocacy, 59 Duke L.J. 447, 470-85 (2009)), and (b) going along with the parties' erroneous stipulations (because of the party-presentation principle). Compare Indep. Ins. Agents of Am., Inc. v. Clarke, 955 F.2d 1077, 1079-80 (D.C. Cir. 1992) (Silberman, J.), with id. at 1078 (Sentelle, J.); see

also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 514-23 (2010) (Breyer, J., dissenting); Gary Lawson, Stipulating the Law, 109 Mich. L. Rev. 1191, 1205-06, 1217-18 (2011).

[2] Questions about the underlying reason why statements made in legal briefs can establish choice of law in the first place. Maybe the reason is a desire to honor the affirmative choice-of-law decisions made by the parties --- which may imply that the court should bring to bear the limits on honoring affirmative choice-of-law decisions made by parties in their contracts. Or maybe it is more passive than that. Maybe legal briefs can establish choice-of-law because by going along with its adversary's choice-of-law assumption, the responding party has forfeited any objection to its adversary's approach. That may imply that a court should undo the parties' shared choice of law based only on the doctrines governing when a party should be relieved from its forfeiture.

And [3] questions about the reason we have the classic no-stipulating-the-law rule in the first place. The underlying idea may be that Article III disables a federal court from issuing an advisory opinion. An interpretation or application of a law whose content is (wrongly) stipulated as A might amount to advice as to how things would look if (counterfactually) the content of the law was, indeed, A. See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 447 (1993). If this is the main basis of the rule, is it not just as advisory to interpret Florida law (because of the litigating parties' assumption) when it is really Oregon law that applies? Or maybe the basis of the classic no-stipulating rule is something else. An interpretation of a law whose content is (wrongly) stipulated may warp the broader fabric of our law --- because how one part of a law is understood can alter how other parts of the law are understood (both in a subsequent case, see Frost, The Limits of Advocacy, at 492-94, or in the case at bar). If that is the animating concern, does it apply when the parties do not attempt to stipulate the content of the law, but rather which body of law applies? Choosing Florida law (when Oregon law should have been selected) does not seem to carry especially pointed risks of warping Florida law.

Questions [1], [2], are [3] are not the only relevant ones, and answering them is not straightforward. But here, all of this can be put aside, because the parties' assumption that New Jersey law governs is sensible enough. While the Plaintiff was working at the Defendant-company and experienced the alleged discrimination at issue in this suit, she was living in and

4

\* \* \*

Under New Jersey law, a valid "agreement to arbitrate, like any other contract, must be the product of mutual assent." Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 442 (2014) (cleaned up).[5]

And when it comes to mutual assent to arbitrate, the bar is set relatively high.

Per the New Jersey Supreme Court, parties must "have full knowledge of [their] legal rights and intent to surrender those rights." Id. at 442 (quoting Knorr v. Smeal, 178 N.J. 169, 177 (2003)). To establish this, there must be contractual language that "clearly and unambiguously signal[s] . . . that [the relevant party is] surrendering her right to pursue her . . . claims in court." Atalese, 219 N.J. at 448. Put another way, the contract must "in some general and sufficiently broad way . . . explain that the [relevant party] is giving up her right to bring her claims in court or have a jury resolve the dispute." Id. at 447.

"No particular form of words is necessary," id. at 444, but there needs to be "language that explains that a party who agrees to arbitration waives the right to sue in court and makes clear that arbitration and civil litigation are distinct proceedings." Flanzman v. Jenny Craig, Inc., 244 N.J. 119, 137 (2020).[6]x

---

working from New Jersey. See Defendants Salesforce, Inc. and Lori Castillo Martinez's Notice of Removal (ECF 1) ¶ 14.

[5] There are other necessary ingredients for a valid contract under New Jersey law. See Stabile v. Macy's, Inc., 751 F. Supp. 3d 429, 433 (D.N.J. 2024). But the parties' back-and-forth concerns only the mutual assent requirement, so the Court zeroes in there.

[6] No one argues that New Jersey's law as to what counts as mutual assent in the arbitration context is at odds with the Federal Arbitration Act --- such that New Jersey law must be pushed aside as preempted. The Court is unaware of any obligation to raise that issue sua sponte. See Stabile, 751 F. Supp. 3d at 441 n.22.

5

### B. The Agreements

Against the above legal backdrop, look now to the relevant materials --- and ask whether they reflect the required mutual assent, such that they add up to a valid agreement to arbitrate.

The Plaintiff signed two agreements[7] at the start of her work.

The first was an offer letter. It states, in relevant part:

> In the event of any dispute or claim relating to or arising out of your employment relationship . . . (including but not limited to, any claims of . . . discrimination), you . . . agree that all such disputes shall be fully and finally resolved by binding arbitration conducted before a single neutral arbitrator pursuant to the rules for arbitration of employment disputes by the American Arbitration Association (available at www.adr.org or from Human Resources) . . . . By executing this Agreement, you and the Company are both waiving the right to a jury trial with respect to any such disputes . . . . Notwithstanding the foregoing, nothing in this Agreement shall preclude the Company or you from bringing proceedings before the courts of any competent jurisdiction to enforce intellectual property rights . . . .
>
> You will also be required to sign an Employee Inventions and Proprietary Rights Assignment Agreement and the Company's Code of Conduct as a condition of your employment. . . .

Offer Letter at 2-3.

The document referenced in the offer letter, the "Employee Inventions and Proprietary Rights Assignment Agreement," included identical operative language, see Assignment Agreement at 5-6 (¶ 19), but was formatted a bit differently --- in the assignment agreement, the relevant language was offset in a

---

[7] See Declaration of Quincy E. Johnson in Support of Defendants' Motion to Compel Arbitration, Exhibit 1 ("Offer Letter") (ECF 8-3) at 3; Declaration of Quincy E. Johnson in Support of Defendants' Motion to Compel Arbitration, Exhibit 2 ("Assignment Agreement") (ECF 8-4) at 6.

6

numbered paragraph with a bolded label of "Arbitration Agreement." See id. at 5.

### C. Analysis

The language set out above seems to check all the boxes.

To establish mutual assent, as noted in Part II.A, New Jersey law requires the relevant contract to "explain that the [relevant party] is giving up her right to bring her claims in court or have a jury resolve the dispute," Atalese, 219 N.J. at 447, with "language that explains that a party who agrees to arbitration waives the right to sue in court and makes clear that arbitration and civil litigation are distinct proceedings." Flanzman, 244 N.J. at 137.

And the two agreements here do just that:

> In the event of any . . . claim relating to . . . [her] employment . . . (including . . . any claim[] of . . . discrimination), [the Plaintiff] . . . agree[s] that all such disputes shall be fully and finally resolved by binding arbitration conducted before a single neutral arbitrator[, and that] . . . . [b]y executing this Agreement, [the Plaintiff] . . . [is] . . . waiving the right to a jury trial. . . .

Offer Letter at 3; Assignment Agreement at 5 (¶ 19).

\* \* \*

Against this clear language, the Plaintiff argues that there was no mutual assent for four reasons.

But this argument does not work.

\* \* \*

First, as to the assignment agreement, the Plaintiff contends that there was no mutual assent because the arbitration provision was "buried" in the nineteenth paragraph of an eight-page document. Plaintiff's Brief at 4.

But courts applying New Jersey law routinely uphold arbitration agreements that are part of similarly long (or longer) contracts. See, e.g., Noonan v. Comcast Corp., 2017 WL 4799795, at *1, *7-8 (D.N.J. Oct. 24, 2017) (upholding an arbitration agreement within a larger "thirty page[]" commercial contract that was "over 3,000 words, and single spaced with no table of

7

contents"); Russo v. Chugai Pharma USA, Inc., 2021 WL 420498, at *1, *4-5 (N.J. Super. Ct. App. Div. Sept. 16, 2021) (rejecting the argument that an arbitration clause was "buried" when it appeared two-thirds of the way through a six-page "Proprietary Information and Inventions" agreement); Colon v. Strategic Delivery Sols., LCC, 459 N.J. Super. 349, 356-57, 360-62 (App. Div. 2019) (upholding an arbitration provision in paragraph 20 of a 27-paragraph, nine-page services agreement, see Motion Dismissing Complaint, No. L-003994-16, at 8-16 (N.J. Super. Ct. L. Div. July 20, 2017)), aff'd sub nom in Arafa v. Health Express Corp., 243 N.J. 147, 154-55, 172 (2020) (concluding that "the Appellate Division [in Colon] properly found plaintiffs knowingly and voluntarily waived the right to pursue their statutory wage claims in court"); see also, e.g., Foulke Mgmt. Corp. v. Domestic Linen Supply Co., 2020 WL 1062867, at *3-5 (N.J. Super. Ct. App. Div. Mar. 5, 2020) (upholding an arbitration clause in paragraph 15 of a broader commercial services agreement); see generally Martindale v. Sandvik, Inc., 173 N.J. 76, 81-82, 92 (2002) (concluding that valid arbitration agreements can exist as part of a larger employment contract).

\* \* \*

Second, the Plaintiff asserts in her legal brief that because she was hired as a Human Resources Specialist, "it would not be surprising if [she] . . . paid [the assignment agreement] short shrift," since, based on its title[8] and IP-focused subject matter, it "seems clearly aimed at employees functioning in more technical fields."  Plaintiff's Brief at 4, 7.

But even if the Plaintiff skipped over the agreement, and signed it without reading it --- that would not undermine mutual assent.

The New Jersey Supreme Court has so held.  In general.  See Skuse v. Pfizer, Inc., 244 N.J. 30, 54 (2020) ("[O]ne who does not choose to read a contract before signing it cannot later relieve himself of its burdens.") (cleaned up).  And as to arbitration agreements in particular.  See Goffe v. Foulke Mgmt. Corp., 238 N.J. 191, 212 (2019) ("[T]he argument that [a] plaintiff did not understand the import of the arbitration agreement and did not have it explained to her by the dealership

---

[8]  Employee Inventions and Proprietary Rights Assignment Agreement.

8

is simply inadequate to avoid enforcement of [a] clear and conspicuous arbitration agreement[] that [she] signed."); see also Kirleis, 560 F.3d at 162.

There is no reason to disregard these principles here.

The Plaintiff, an HR professional, see Plaintiff's Brief at 7, was presumably more familiar with employment contracts than most. And before she signed the assignment agreement, the Plaintiff agreed that she had "carefully read all of [its] provisions." Assignment Agreement at 6. Moreover, the arbitration part of the assumption agreement was specially and clearly labelled --- a fact that affirmatively supports a mutual assent conclusion. See Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 325-26 (2019) (reasoning from the title of a section as to whether there is mutual assent to arbitrate).

And finally, there was back up. The arbitration language was in the assignment agreement that assertedly may have been glossed over by the Plaintiff. But it was also in another contract the Plaintiff signed: the offer letter. See Offer Letter at 2. And there is no suggestion she may have given "short shrift" to that second agreement.

\*   \*   \*

Third, the Plaintiff notes that "the agreement contains provisions both for claims subject to [a]rbitration and not subject to [a]rbitration" --- and that is said to "add[] to the confusion" of the arbitration provision. Plaintiff's Brief at 4.

But the argument from confusion does not move the needle.

The arbitration language is clear and plainspoken, not confusing.

In addition, the underlying idea expressed by the contract is not itself confusing. There is nothing complex or hard to grasp about the dividing line set down by the agreements --- between what must be arbitrated (discrimination claims, for example) and what does not need to be arbitrated (IP claims).

More fundamentally, laying out the different ways in which different circumstances will be treated --- that does not somehow import a kind of intrinsic confusion. Rather, it is basic, what all but the most simple contracts do. Mutual assent is not undermined by an agreement that certain claims (like

9

discrimination claims) must be treated in one way (arbitrated) while other claims (IP claims) are to be treated in another way (not arbitrated)--- any more than mutual assent would be undermined by an agreement that certain widgets (the first 100) will be treated in one way (bought for $2 each) while other widgets (the next 100) will be treated in another way (bought for $1 apiece).

Indeed, the New Jersey Supreme Court has upheld arbitration agreements that, as here, encompass certain claims but not others.

In Skuse v. Pfizer, for example, the Court upheld an agreement that said this:

> Except as expressly set forth in section 3, titled, "Claims Not Covered by this Agreement," all disputes, claims, complaints, or controversies ("Claims") that you have now or at any time in the future may have against . . . the Company . . . will be resolved by arbitration . . . .

244 N.J. at 38. The fact of "[e]xcept[ions]" did not prevent the New Jersey Supreme Court from concluding that the quoted arbitration agreement "met the standard of clarity . . . in all respects." Id. at 52 (emphasis added).

\*   \*   \*

Fourth and finally, the Plaintiff argues that mutual assent was missing because the two agreements here "do[] not explain how arbitration works or how it is different from a court proceeding." Plaintiff's Brief at 5.

But the agreements refer to the "rules for arbitration of employment disputes by the American Arbitration Association." See Offer Letter at 2; Assignment Agreement at 5 (¶ 19). And those AAA rules --- readily available online, as noted in the agreements --- lay out in detail how arbitration will go. See Documents for Employment Arbitration and Mediation, Am. Arb. Ass'n, https://www.adr.org/industries/employment/#rules-forms-and-fees (last visited Jan. 7, 2026).

That clears things up. See, e.g., Skuse, 244 N.J. at 51-52 (determining that providing the link to an FAQ page that explained the arbitration process supported mutual assent).

Moreover, putting aside the AAA rules that are referred to, the agreements themselves spell out a key difference between arbitration and litigation --- who the decisionmaker will be. Per the agreements, "arbitration [will be] conducted before a single neutral arbitrator," and the contrast with adjudication is explicitly drawn--- the alternative, taken off the table by the agreed-to arbitration clause, is "a jury trial." Offer Letter at 2; Assignment Agreement at 5 (¶ 19).[9]

And finally, the Plaintiff's argument runs aground on the caselaw.

In Flanzman v. Jenny Craig, for example, the New Jersey Supreme Court held that "[a]lthough the Agreement provides only a general concept of the arbitration proceeding that would replace a judicial determination of [the plaintiff's] claims," that was enough --- because the provision "makes clear that the contemplated arbitration would be very different from a court proceeding." 244 N.J. at 138.

The agreement in Flanzman, see id. at 126, was about as specific as to the arbitration agreements in play here.

---

[9] Two things here. First, for more ways in which the agreements explain what arbitration is, see the offer letter at 2 (describing the arbitrator's ability to "permit adequate discovery" and "award all remedies otherwise available in a court of competent jurisdiction," and the arbitrator's responsibility to "issue an award in writing and state the essential findings and conclusions on which the award is based"), plus the mirror-image language in the assignment agreement. Second, the agreements note that arbitration decisions may need to be enforced in court. This does not blur the line between arbitration and adjudication. If anything, it emphasizes that arbitration and adjudication are separate. And courts applying New Jersey law routinely enforce arbitration agreements that note that judicial involvement may be necessary to enforce an arbitration decision. See, e.g., Griffoul v. NRG Residential Solar Sols., LLC, 2018 WL 2071252, at *1,6 (N.J. Sup. Ct. App. Div. May 4, 2018); DiValerio v. Best Care Lab'y, LLC, 2021 WL 4704963, at *2, *9 (D.N.J. Oct. 8, 2021) (similar); see also Delaney v. Dickey, 244 N.J. 466, 262, 273-74 (2020) (stating in dicta that an arbitration agreement with similar language "would be enforceable").

11

So if the Flanzman agreement cleared the bar, then the agreements here do, too.  See also Frederick v. Law Off. of Fox Kohler & Assocs. PLLC, 852 F. App'x 673, 675-78 (3d Cir. 2021) (upholding an arbitration agreement with similar language to the ones at issue in this case).[10]

\*   \*   \*

Bottom line: there was a valid agreement to arbitrate, and that conclusion is not undone by the Plaintiff's four arguments as to why there was assertedly no mutual assent here.

### III. Scope

Given that there was a "valid" arbitration agreement, move now to the next question: does "the particular dispute [raised by the lawsuit] fall[] within the scope of [the] agreement [to arbitrate]"?  Kirleis, 560 F.3d at 160.

If yes, it is over to arbitration.  If no, the case keeps going before the court.

And there is a third possibility, too, implicated by this case: arbitration is compelled not because the dispute in question fits within the arbitration agreement --- but because whether the dispute fits within the agreement is the arbitrator's call to make in the first place.

\*   \*   \*

Does a dispute sit within the scope of the arbitration agreement such that it must be arbitrated --- that question can be lawfully delegated by the agreement to the arbitrator, for her to resolve.  See Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 65 (2019).

How to know whether the agreement delegates this question to the arbitrator?

---

[10]  And note: the Flanzman agreement was much less specific as to what arbitration entails when weight is given to the fact that the agreements in this case incorporate by reference the AAA rules --- and those rules, as noted, explain in close detail how arbitration can be expected to go.

12

"[C]ourts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options, 514 U.S. at 944.

But per the Supreme Court, there is an "important qualification" to this. Id. Namely, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." Id. (cleaned up) (emphasis added).[11]

\* \* \*

The two arbitration agreements here do not expressly delegate to the arbitrator the should-this-dispute-be-arbitrated question.

But the agreements explicitly incorporate the rules of the American Arbitration Association. See Offer Letter at 2; Assignment Agreement at 5.

And the AAA rules are plain: they give the arbitrator the power to decide whether a particular dispute must be arbitrated. See, e.g., Am. Arb. Ass'n, Employment Workplace Arbitration Rules & Mediation Procedures, R-7(a) (2025) ("The arbitrator shall have the power to rule on their own jurisdiction, including any

---

[11] It seems that the Supreme Court was applying the "clear and unmistakable" standard as a matter of federal common law. Does state law nonetheless have a role to play? No, if delegation is a purely federal-law question. See, e.g., Blanton v. Domino's Pizza Franchising LLC, 962 F.3d 842, 846-47 (6th Cir. 2020) (concluding as much); Brennan v. Opus Bank, 796 F.3d 1125, 1129-31 (9th Cir. 2015) (suggesting the same). Yes, if delegation is something of a mixed question of federal and state law. Cf. In re Remicade (Direct Purchaser) Antitrust Litig., 938 F.3d 515, 520 (3d Cir. 2019) (where "[t]he parties disagree[d] as to the applicable body of law" to be used in addressing the scope of an arbitration agreement, concluding that "[t]he truth . . . lies somewhere in between" state and federal law). But here, none of this matters --- because the New Jersey Supreme Court has adopted the "clear and unmistakable" approach for itself as a matter of New Jersey law. See Morgan v. Sanford Brown Inst., 225 N.J. 289, 304-05, 312 (2016); see also Moon v. Breathless Inc., 868 F.3d 209, 213 (3d Cir. 2017). So the standard to apply ("clear and unmistakable") is the same here --- whether federal law governs on its own, or whether state law (New Jersey law, in this case) also gets a seat at the table.

13

objection with respect . . . the arbitrability of any claim or counterclaim").

Against this backdrop, "'[v]irtually every circuit to have considered the issue[12] has determined that [an arbitration agreement's] incorporation [by reference] of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'" Chesapeake Appalachia, LLC v. Scout Petrol., LLC, 809 F.3d 746, 763-64 (3d Cir. 2016) (first and fourth alterations in original) (quoting Oracle Am. Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074 (9th Cir. 2013)); see also Contec Corp. v. Remote Sol. Co., 398 F.3d 205, 208 (2d Cir. 2005); Petrofac, Inc. v. DynMcDermott Petrol. Operations Co., 687 F.3d 671, 675 (5th Cir. 2012); Fallo v. High-Tech Inst., 559 F.3d 874, 877-78 (8th Cir. 2009); Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1372-73 (Fed. Cir. 2006), abrogated on other grounds by Henry Schein, 586 U.S. 63; Terminix Int'l Co. v. Palmer Ranch LP, 432 F.3d 1327, 1332 (11th Cir. 2005); Blanton, 962 F.3d at 844-46; Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 11 (1st Cir. 2009); see also Belnap v. Iasis Healthcare, 844 F.3d 1272, 1283-84 (10th Cir. 2017) (holding similarly where JAMS rules were incorporated into an agreement); Simply Wireless, Inc. v. T-Mobile US, Inc., 877 F.3d 522, 527-29 (4th Cir. 2017) (same), abrogated on other grounds by Henry Schein, 586 U.S. 63; Chevron Corp. v. Ecuador, 795 F.3d 200, 207-08 (D.C. Cir. 2015) (holding similarly where UNCITRAL arbitration rules were incorporated).

Does this principle apply even where, as here, the arbitration contract is not part of a commercial contract --- but rather is part of a contract in the employment context?

"Yes" is the answer from New Jersey district courts. See, e.g., Solecitto v. Axon Enter., Inc., 2025 WL 2803382, at *5-6 (D.N.J. Oct 2, 2025); Solecitto v. Axon Enter., Inc., 2024 WL 4213684, at *1 (D.N.J. Sept. 16, 2024); Dorset v. United Healthcare Servs., Inc., 2025 WL 2779224, at *8 (D.N.J. Sept. 30, 2025); Carrone v. UnitedHealth Grp. Inc., 2020 WL 4530032, at *3 (D.N.J. Aug. 6, 2020).

---

[12] The Third Circuit has not yet weighed in. See Field Intel. Inc. v. Xylem Dewatering Sols. Inc., 49 F.4th 351, 356 n.1 (3d Cir. 2022) (opting to "save [the question] for another day").

14

And from district courts around the country.  See, e.g., Fischer v. Kelly Servs. Glob., LLC, 2024 WL 382181, at *11-14 (S.D. Cal. Jan. 31, 2024); Crooms v. Sw. Airlines Co., 459 F. Supp. 3d 1041, at 1055-56 (N.D. Ill. 2020); Snow v. Pepsi MidAmerica Co., 2022 WL 2106249, at *4-5 (S.D. Ill. June 10, 2022); Bonner v. Point72 Asset Mgmt., L.P., 2018 WL 11223154, at *2-3 (S.D.N.Y. July 5, 2018); Getzelman v. Trustwave Holdings, Inc., 2014 WL 3809736, at *4 (D. Colo. Aug. 1, 2014); Durkee v. NBT Bancorp, Inc., 2024 WL 1859385, at *4 (D. Vt. Apr. 29, 2024).

Three courts of appeals have gone the same way.  See Blanton, 962 F.3d at 843-46; Brennan v. Opus Bank, 796 F.3d 1125, 1130-31 (9th Cir. 2015); Belnap, 844 F.3d at 1274-76, 1281-83 (applying the referenced principle to an independent contractor's agreement to provide "management and consulting services") (cleaned up).

Pulling all this together, the overwhelming weight of authority supports this legal principle:

It is generally for the arbitrator to decide whether a given dispute must be arbitrated when (i) an arbitration agreement that is part of an employment contract explicitly incorporates the rules of an arbitration association, and (ii) the association rules give the arbitrator the power to decide whether a particular dispute falls within the arbitration agreement.

Applying this principle here, the Court holds that given (i) the arbitration agreements' reference to the AAA rules, and (ii) what those rules say --- the question of whether the Plaintiff's claims must be arbitrated is for the arbitrator to resolve.

\*   \*   \*

To be sure, there are exceptions to the broad legal principle set out above.

First, if the underlying arbitration association rules are not themselves "clear," First Options, 514 U.S. at 944 (cleaned up), then those rules cannot be a basis for delegating the whether-to-arbitrate question to the arbitrator.

But here, the association rules, quoted above, are straightforward.  See Am. Arb. Ass'n, Employment Workplace Arbitration Rules & Mediation Procedures, R-1, R-7 (2025).

15

<u>Second</u>, there may be an exception to the arbitrator-decides principle where the arbitration association rules are not readily available online --- such that their content cannot be treated as "unmistakable." <u>First Options</u>, 514 U.S. at 944 (cleaned up).

But that is not this case. The relevant AAA rules are easy to find. <u>See</u> Assignment Agreement at 5 (language pointing to the website where the AAA rules are); <u>See</u> Offer Letter at 2 (same).

<u>Third</u>, there may also be an exception to the above-cited principle where the person who signed the arbitration agreement is "unsophisticated" in a relevant way. Some courts have made this suggestion. <u>See</u>, <u>e.g.</u>, <u>Oracle</u>, 724 F.3d at 1075 (seeming to limit its holding to agreements "between sophisticated parties to commercial contracts").[13]

But that cannot get off the ground here. The Plaintiff does not assert that she was inexperienced when it comes to employment contracts. And it is hard to know how she could make such an argument --- she is an HR professional.

A <u>fourth</u> and final exception: Sometimes, (1) the arbitration agreement points to (2) arbitration association rules, and those association rules point to (3) another document --- and it is only at the last step, (3), that it is made clear that it is the arbitrator who will decide what goes to arbitration. That can sometimes be too much hopscotching to pass the "clear and unmistakable" test. <u>See</u> <u>Chesapeake Appalachia</u>, 809 F.3d at 761; <u>see</u> <u>also</u> <u>Richardson</u> v. <u>Coverall N. Am., Inc.</u>, 811 F. App'x 100, 103 n.2 (3d Cir. 2020).

But there is nothing like that here. The association rules themselves, on the website that is expressly referred to in the arbitration agreements, indicate what the arbitrator's role will

---

[13] <u>But</u> <u>cf</u>. <u>Brennan</u>, 796 F.3d at 1131 ("the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without explicitly limiting that holding to sophisticated parties or to commercial contracts") (citing <u>Petrofac</u>, 687 F.3d at 675; <u>Republic of Arg.</u> v. <u>BG Grp. PLC</u>, 665 F.3d 1363, 1371 (D.C. Cir. 2012), <u>vacated on other grounds</u> in 555 F. App'x 2 (D.C. Cir. 2014); <u>Fallo</u>, 559 F.3d at 878; <u>Qualcomm</u>, 466 F.3d at 1373; <u>Terminix</u>, 432 F.3d at 1332; <u>Contec Corp.</u>, 398 F.3d at 208; and <u>Awuah</u>, 554 F.3d at 10-12).

16

be.  There is not, here, the sort of "'daisy-chain' of inferences" that causes concern.  <u>Richardson</u>, 811 F. App'x at 103 n.2 (quoting <u>Chesapeake Appalachia</u>, 809 F.3d at 761)).

\*   \*   \*

"When the parties' contract delegates the arbitrability question to an arbitrator, . . . a court possesses no power to decide the arbitrability issue."  <u>Henry Schein</u>, 586 U.S. at 68.

That is this case.  By referring to the AAA rules, the arbitration agreements buck the arbitrability question to the arbitrator.  Whether the Plaintiff's claims must be arbitrated is for the arbitrator to decide.

## IV.  Conclusion

The Defendants' motion to compel arbitration is granted.[14]

This case is stayed pending the outcome of arbitration.

Within fourteen calendar days of any final decision by the arbitrator as to whether the claims here must be arbitrated, and/or as to liability, counsel shall file a joint status update detailing the status of this litigation and whether the stay should be lifted.

IT IS on this 9th day of January, 2026, **SO ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.

---

[14] The Defendants' request for attorney's fees, <u>see</u> Defendants' Brief at 16, is denied.  The Plaintiff's arguments here were not "so lacking in merit that costs and attorney's fees should be [imposed] against [her]."  <u>Mobil Oil Corp.</u> v. <u>Indep. Oil Workers Union</u>, 679 F.2d 299, 305 (3d Cir. 1982) (first alteration in original).

17